Tate Justesen, Ore. Bar #083741
Aaron Bruner, Ore. Bar #133113
Western Resources Legal Center
9220 SW Barbur Blvd., Suite 119-327
Portland, OR 97219
Telephone: (503) 768-8500
E-Mail:  tjustesen@wrlegal.org
E-Mail:  abruner@wrlegal.org

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **CAHILL RANCHES, INC.**, an Oregon Corporation<br><br>    Plaintiff,<br><br>vs.<br><br>**BUREAU OF LAND MANAGEMENT**,<br><br>    Defendant. | No.<br><br>**COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF** |

COMPLAINT - Page 1

## INTRODUCTION

1.      This case challenges the Bureau of Land Management ("BLM") Director's 2015 decision to eliminate grazing on the Sucker Creek pasture of the Rahilly-Gravelly allotment in the BLM Lakeview Resource Area in Oregon.  As discussed in more detail below, the 2015 decision was made in the Oregon Sub-Regional Greater Sage Grouse Resource Management Plan Amendment ("2015 RMPA").  In the intervening years since the 2015 decision, the BLM issued a scoping notice in 2017 regarding its intent to amend the 2015 RMPA and, in March 2019, issued a final environmental impact statement ("2019 FEIS").  Additionally, in March 2019, BLM issued final Resource Management Plan Amendments ("2019 RMPA"), which included a reversal of the decision to close the Sucker Creek pasture to grazing.  However, the 2019 RMPA was enjoined in October 2019 by Judge B. Lynn Winmill of the U.S. District Court for the District of Idaho (in *Western Watersheds Project v. Schneider*, Case No. 1:16-cv-00083-BLW).  Judge Winmill's 2019 injunction leaves the 2015 RMPA as the legally governing land use directive for an enormous swath of federal land in the Great Basin Region, which includes reinstatement of the grazing prohibition on the Sucker Creek pasture.  Plaintiff is negatively affected by the resurrected 2015 RMPA as it prohibits Plaintiff's use of the Sucker Creek pasture for livestock grazing, as discussed in more detail below.

2.      This is a classic case in which a federal agency, driven by pressure to make a decision at a national level, ignored a decision by the same agency at the local level on the same matter.  In its haste to make a decision at the very highest levels of the BLM in Washington D.C. to constrain livestock grazing for the greater sage grouse, the headquarters' 2015 decision completely reverses a prior decision made to allow grazing on the Rahilly-Gravelly grazing allotment consistent with conservation of sage grouse.  The headquarters' decision was made

without any apparent consideration of the local allotment-level decision, the localized facts

supporting the local decision, and without any explanation that supports the reversal of position.

This is contrary to the Administrative Procedure Act ("APA"), which holds that an agency

decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect

of the problem" or offered an explanation "that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983); 5 U.S.C. § 706.

3.      Plaintiff Cahill Ranches, Inc. ("Cahill Ranches") challenges the BLM Director's

September 2015 decision to eliminate grazing entirely on the Sucker Creek pasture on the

Rahilly-Gravelly grazing allotment where Cahill Ranches holds a permit to graze cattle.  The

Rahilly-Gravelly Allotment is 18,678 acres located in the BLM Lakeview Resource Area in

Oregon.  The 8,282-acre Sucker Creek pasture is in the heart of the allotment and elimination of

grazing there virtually eliminates grazing on the entire allotment because grazing the Sucker

Creek pasture in alternate years is vital to allow the other pastures in the allotment to be rested as

part of the rotational grazing scheme.  The decision to eliminate grazing on the 8,282-acre

Sucker Creek pasture was made in Washington D.C. by the Director of the BLM in the Oregon

Sub-Regional Greater Sage Grouse Resource Management Plan Amendment ("2015 RMPA")

and Record of Decision ("ROD") covering over 125,000,000 acres of federal land for the Great

Basin Region.

4.      Grazing was eliminated on the Sucker Creek pasture not because grazing was

harming sage grouse.   In fact, at the time of the 2015 RMPA, it is understood that sage grouse

were doing well in the Rahilly-Gravelly Allotment.  Rather, grazing was eliminated to provide

for a study control area, where vegetation would be allowed to develop naturally to determine

how it would affect sage grouse relative to areas where vegetation is being managed.  The 2015 RMPA did not authorize or fund such a study and such a study is not necessary in the area because there was already a large cooperative scientific vegetation study of the relationship between sage grouse productivity and juniper removal in the area that occurred from 2007 to 2014.  Study participants included the Bureau of Land Management, the Natural Resource Conservation Service, the Oregon Department of Fish and Wildlife, and private ranchers, including Cahill Ranches.  The study concluded that there was a significant improvement in sage grouse reproduction and survival in areas where juniper is removed relative to areas where juniper is left untreated.

5.    Thus, the decision to eliminate grazing from the Sucker Creek pasture for the sake of research is: (1) not needed; (2) will be detrimental to sage grouse as juniper grows and expands on unmanaged pasture; and (3) does not provide for the orderly use, improvement, and development of the range within the grazing district in violation of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1301 *et seq.* and The Taylor Grazing Act, 43 U.S.C. § 315.

## **JURISDICTION**

6.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*; the Taylor Grazing Act, 43 U.S.C. § 315 *et seq.*; the APA, 5 U.S.C. §§ 701 *et seq.*; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*  There also is jurisdiction under 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. § 2201 (injunctive relief).

///

7.      Plaintiff fully participated at every stage of this agency action by commenting on the 2015 RMPA and exhausted its administrative remedies by filing a protest of the decision.  An actual, justiciable controversy now exists between plaintiff and defendant because the land use decision to eliminate grazing from the Sucker Creek pasture is final agency action ripe for judicial review.  The requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-06.  Defendant has waived sovereign immunity pursuant to 5 U.S.C. § 702.

## **VENUE**

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because defendant, Bureau of Land Management, maintains offices in this District, the Rahilly-Gravelly Allotment is located in the District, and plaintiff's ranch is in the District. For the same reasons, divisional venue lies in the Medford Division.  LR 3-2.

## **PARTIES**

9.      Plaintiff Cahill Ranches is an Oregon corporation that grazes livestock, on private land and on BLM-owned public lands, in southeast Oregon within the Lakeview Ranger District. For over 50 years, Cahill Ranches has held a permit to graze cattle on the Rahilly-Gravelly Allotment.  The allotment became a part of a Research Natural Area when BLM adopted the 2003 Lakeview Resource Management Plan and grazing continued as a compatible use. However, the Oregon Sub-Regional Greater Sage Grouse 2015 RMPA directed the elimination of grazing from 8,282 acres of the allotment's 18,678 total acres—a reduction of 44 percent of Cahill Ranches' permitted use.

10.     Defendant, the United States Bureau of Land Management, is a federal agency within the Department of the Interior and is responsible for the management of approximately

264 million acres of federal lands across the West and 15.7 million acres in Oregon (nearly one-fourth of the state's total land area).

## LEGAL FRAMEWORK

**Taylor Grazing Act.**

11.    Under the Taylor Grazing Act of 1937 ("TGA"), the Secretary of the Interior is authorized to establish grazing districts on unreserved lands "which are chiefly valuable for grazing and raising forage crops." 43 U.S.C. § 315.  To that end, BLM is directed to "make provision for the protection, administration, regulation and improvement of . . . grazing districts," and it must "provide for the orderly use, improvement, and development of the range." *Id.*

12.    Once established, the dominant purpose of these grazing districts must be grazing and the Secretary must ensure that grazing districts are "adequately safeguarded." 43 U.S.C. §§ 315, 315b. "Congress intended that once the Secretary established a grazing district under the TGA, the primary use of that land should be grazing." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1308 (10th Cir. 1999), *aff'd on other grounds*, 529 U.S. 728 (2000).  Put simply, the TGA limits BLM's discretion to devote grazing districts for purposes other than grazing.

13.    To "terminate" grazing on an allotment within a grazing district, the BLM must find that those lands are no longer chiefly valuable for grazing.  United States Dept. of the Interior, Office of the Solicitor, Clarification of Solicitor Opinion M-37008 at 3 (2003) ("BLM must express this determination and support it by proper findings in the record of decision that concludes the land use planning process.").  If, on the other hand, the lands remain chiefly valuable for grazing, "the lands must remain in the grazing district." *Id.*

///

**Federal Land Policy and Management Act.**

14.    In enacting the Federal Land Policy and Management Act of 1976 ("FLPMA"),
Congress declared that "it is the policy of the United States that . . . the public lands be managed
in a manner which recognizes the Nation's need for domestic sources of . . . food." *Id.* §
1701(a)(12).  In accordance with that policy, FLPMA requires that that BLM "use and observe
the principles of multiple use and sustained yield" in developing and revising land use plans for
public lands.  43 U.S.C. §§ 1712(a), (c).  FLPMA defines "sustained" yield as the "achievement
and maintenance of a high-level annual or regular periodic output of the various renewable
resources of the public lands consistent with multiple use." *Id.* § 1702(h).  Multiple use is
defined as management of "balanced and diverse resource uses . . . , including, but not limited to,
recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and
historical values." *Id*. § 1702(c).  Such management seeks a balance between all uses and "takes
into account the long-term needs of future generations for renewable and non-renewable
resources" as well as the "relative values of the resources." *Id.*

15.    FLPMA directs that "the public lands be managed in a manner which recognizes
the Nation's need for domestic sources of minerals, food, timber, and fiber from the public
lands." *Id.* at § 1701(a)(12).  FLPMA authorizes BLM to issue grazing permits and leases for
domestic livestock grazing.  *Id.* at § 1752.  The grazing permits and leases specify the numbers
of animals to be grazed and the seasons of use and significant changes to the permits and leases
must be based on a reexamination and finding "that the condition of the range requires
adjustment in the amount or other aspect of grazing use." *Id.* at § 1752(e).

16.    FLPMA works in concert with other federal laws, including the TGA, to regulate
federal lands.  *Id.* § 1701(b).  FLPMA did not repeal the TGA, and FLPMA provides that

"[FLPMA] shall be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law." *Id.* FLPMA considers domestic livestock grazing a principal or major use of the public lands. *Id.* § 1702(*l*).

**Administrative Procedure Act.**

17.     The APA establishes a process for judicial review of agency decisions for those seeking redress of their grievances as the result of a final agency action. 5 U.S.C. § 704.

18.     A court shall "hold unlawful and set aside agency action, findings, and conclusions found to . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . [or] without observance of procedure required by law." *Id.* § 706(2)(A) and (C)-(D).

## FACTS

## Cahill Ranches and Rahilly-Gravelly Allotment

19.     Cahill Ranches has, over the past 50 years, successfully managed the Rahilly-Gravelly Allotment in a way that promotes both grazing and sage grouse habitat consistent with the BLM's multiple use management mandates.

20.     Cahill Ranches has worked cooperatively with BLM on a sage grouse - juniper research project to ensure that the range is meeting ecological and wildlife goals on both private and federal lands. The BLM conducted a sage grouse radio telemetry study in the Warner Mountains and the Rahilly-Gravelly area in partnership with the Natural Resource Conservation Service ("NRCS"), the Oregon Department of Fish and Wildlife ("ODFW"), the BLM, and Cahill Ranches. Cahill Ranches deferred juniper removal on its property and on its BLM grazing

allotment to serve as a control area to compare sage grouse productivity relative to study areas where juniper was removed.

21.     After conclusion of the research project, Cahill Ranches, in cooperation with NRCS, has removed over 1,200 acres of juniper on its private lands.  Cahill Ranches also has implemented sage grouse habitat improvement projects on its property, including fence removal and water development.  The decision to eliminate grazing from the Sucker Creek pasture fails to consider the overall impact on the economic viability of Cahill Ranches and, consequently, whether Cahill Ranches can afford to continue sage grouse habitat improvement projects.

22.     As concerns over the species have heightened, sage grouse habitat had improved over the past 15 years on the Rahilly-Gravelly Allotment preceding the issuance of the 2015 RMPA.  Sage grouse populations also have remained stable or improved on the allotment over the same time period.  In part, this success is due to a rest-rotation grazing strategy that the local BLM office approved for use by Cahill Ranches.

23.     A rest-rotation grazing strategy limits grazing of a particular pasture to alternate years.  In a given year, one pasture is rested from grazing, and other pastures within the allotment are grazed, and in the following year, grazing is shifted and a different pasture is rested.  Thus, each pasture in an allotment managed with a rest-rotation grazing strategy is an integral part of the entire allotment.  Elimination of grazing on a pasture will significantly reduce or eliminate the ability to graze on the remaining pastures within the allotment.

24.     In the case of the Rahilly-Gravelly Allotment, the elimination of the Sucker Creek pasture, which comprises 44% of the allotment, renders it impossible to maintain the permitted grazing levels on the allotment.

COMPLAINT - Page 9

25.     The Oregon Sub-Regional Greater Sage Grouse 2015 RMPA and ROD provides for the elimination of grazing from 8,282 acres of the 18,678 total acres on the Rahilly-Gravelly Allotment and a corresponding reduction of 630 Animal Unit Months ("AUMs") of permitted use from the Cahill Ranches permit.  2015 RMPA at 2-18.  In particular, the BLM plans to eliminate grazing from the Sucker Creek pasture of the allotment, despite the agency's own findings that the Sucker Creek pasture and the Rahilly-Gravelly Allotment as a whole are in good health.

26.     The Sucker Creek pasture, where the BLM's 2015 RMPA eliminates grazing, has been well managed.  Cahill Ranches has ensured that the pasture is grazed only every other year and, that when the pasture is grazed, utilization of the available forage does not exceed 51 percent.  Records show that grazing also is low intensity in areas of the pasture where the BLM has identified sage grouse breeding and nesting areas or "leks."  Furthermore, the BLM has found that the Rahilly-Gravelly Allotment is: (1) making significant progress towards meeting the Oregon Standards for Rangeland Health; (2) conforming to the Guidelines for Livestock Grazing Management; and (3) that sage grouse habitat is improving, including on the Sucker Creek pasture.

27.     In the experience of Cahill Ranches, under good grazing management practices, sage grouse conservation and livestock grazing can beneficially co-exist.

**Oregon Greater Sage-Grouse Conservation Assessment Strategy**

28.     In response to the 2010 U.S. Fish and Wildlife Service's recommendation to list the sage grouse under the Endangered Species Act, ODFW developed an Oregon Greater Sage Grouse Conservation Assessment and Strategy in 2011 ("ODFW Strategy").

29.    The ODFW Strategy recognized that "[f]rom a habitat fragmentation standpoint, ranching was the most environmentally benign land use and accumulated fewer human features than landscapes that also contained tillage agriculture, energy development, or both in Wyoming and Montana (Naugle et al 2011.  Ranching as a land use generally supported greater biodiversity as measured by native plant species and shrub/grassland nesting birds than exurban developments or reserves (Stohlgren et al. 1999, Maestas et al. 2002; 2003)."  ODFW Strategy at 29.

30.    The ODFW Strategy defined "development actions," which triggered specific mitigation for sage grouse.  A development action "means any activity subject to regulation by local, state, or federal agencies that could result in the loss of fish and wildlife habitat."  *Id.*

31.    Significantly, "[d]evelopment action <u>does</u> <u>not</u> include activities associated with the continued maintenance and operation of livestock ranching operations which manage for sustainable native rangelands, as determined by BLMs Rangeland Health Assessment or other recognized monitoring techniques appropriate for shrub steppe habitats in Oregon."  ODFW Strategy at 29 (emphasis added).

32.    The ODFW has written a letter stating it does not support removing grazing from the Research Natural Area in the Rahilly-Gravelly Allotment.  ODFW explained that removal of grazing will not improve sage grouse habitat quality and that juniper encroachment reduces habitat quality.

## Environmental Assessment for The Rahilly-Gravelly Allotment

33.    BLM prepared an environmental assessment ("EA") under the National Environmental Policy Act for the Cahill Grazing permit renewal for the Rahilly-Gravelly Allotment.

34.     Based on the environmental assessment, BLM issued a proposed decision in May 2014 permitting grazing to continue on a rest-rotation grazing scheme for the Rahilly-Gravelly Allotment for 10 years.

35.     The proposed decision provided thirty days for an administrative protest, but no one protested the proposed decision.  ("Allotment Decision").  There were no protests by anti-grazing groups, or anyone else, of the decision to continue grazing on the Rahilly-Gravelly Allotment.  Under the BLM regulations, in the absence of a protest, the proposed decision became the final decision without further notice.  43 C.F.R. § 4160.3; Allotment Decision at 18.

36.     As part of the environmental analysis to support the Allotment Decision on the grazing permit renewal, "[e]xisting sage grouse habitats were assessed in accordance with several protocols, including the *Sage Grouse Habitat Assessment Framework*. . . . Grazing practices addressed within the range of alternatives considered both livestock management objectives and potential impacts to greater sage grouse habitat.  The EA addressed the potential direct, indirect, and cumulative effects of vegetation treatments on greater sage grouse habitat." Allotment Decision at 16.

37.     The Allotment Decision concluded that, "[b]ased on the analysis of potential impacts contained within the EA, there is no reason to consider deferring the issuance of the term grazing permit or deferring implementation of the proposed projects, as the decision would not result in sage grouse population loss within PPH." *Id.*

38.     Furthermore, the BLM Field Manager in his Allotment Decision considered the ODFW sage grouse strategy and concluded that:

> Off-site mitigation was not deemed necessary for several reasons. First, as stated earlier my proposed decision conforms with ODFW (2005) livestock grazing management guidelines.  Further, the ODFW's current sage grouse plan (2011, page 79) "recognizes that livestock ranching operations which manage for

ecologically sustainable native rangelands are compatible with sage grouse conservation, and necessary management activities to maintain a sustainable ranching operation are not considered 'development actions' under the application of the Mitigation Policy to sage grouse habitat." As a policy matter, ODFW does not consider issuing a grazing permit or associated range improvement projects to be actions that require mitigation.

*Id.*

39.      Sixteen months later, the Oregon Greater Sage Grouse 2015 RMPA and ROD concluded that grazing had to be significantly curtailed on the Rahilly-Gravelly Allotment.

## RMPA and ROD

40.      The Oregon 2015 RMPA and ROD are an outgrowth of the 2010 decision by the U.S. Fish & Wildlife Service ("FWS") that listing of the greater sage grouse ("GRSG") was "warranted, but precluded" by higher listing priorities.  75 Fed. Reg. 13910 (Mar. 23, 2010).  In the 2010 FWS proposed listing decision ("2010 Finding"), FWS reached a general conclusion that "absence of adequate regulatory mechanisms is a significant threat to species." *Id*. at 13982. Crucially, the FWS did not conclude that existing regulatory mechanisms relating to livestock grazing and range management were inadequate.  Although in some cases, it was unclear whether existing regulatory mechanisms were being implemented in a manner to conserve sage grouse.  Instead, FWS concluded that the existing regulatory framework of "RMPs, AMPs [Allotment Management Plans], and the permit renewal process provide an adequate regulatory framework." *Id*. at 13977.

41.      In response to the 2010 Finding, the Department of Interior announced its National Planning Strategy to amend some 88 Resource Management Plans ("RMPs") pursuant to FLPMA (BLM) and National Forest Management Act (Forest Service), and through a NEPA process to include sage grouse specific direction by September 2014.  *See* Bureau of Land Mgmt., Dep't of Interior, Instruction Memorandum 2012-044, BLM National Greater GRSG

Land-Use Planning Strategy (December 2011). That process has been coordinated under two administrative planning regions: The Rocky Mountain Region and the Great Basin Region. The Great Basin Region at issue here includes the land use plan amendments in California, Nevada, Oregon, Idaho, and portions of Utah and Montana. After a concurrent 30-day protest period and 60-day Governors' Consistency Review under FPLMA, the BLM finalized the agency action with the execution of ROD(s) on or about September 21, 2015 ("Great Basin ROD") signed by the Director of BLM and the Assistant Secretary of Interior for Lands and Minerals Management.

42.     The Great Basin ROD approves amendments to the Oregon Sub-Regional RMP that eliminates 8,282 acres from grazing on the Rahilly-Gravelly Allotment. The Great Basin ROD is the regional planning-level conclusion of this sage grouse decision-making process. That top-down process, being geared toward regional and national issues, ignored significant on-the-ground facts at the local level that indicated sage grouse habitat and populations are steady or improving on the Rahilly-Gravelly Allotment.

### Research Natural Area

43.     The Rahilly-Gravelly Allotment is part of a Research Natural Area ("RNA") designated by BLM in 2000, in part because it is representative of the Western juniper/big sagebrush-bitterroot community. Grazing was allowed to continue within the Rahilly-Gravelly RNA pastures after the RNA was established.

44.     The local BLM Office, in evaluating RNAs in the Lakeview District, expressed concern about creating an RNA in the Sucker Creek pasture. They noted that "juniper encroachment is a serious threat to habitat and could not be treated under proposed RNA

management; If you do not drop entire allotment from key RNA list, then recommending dropping this pasture so that juniper treatment/habitat restoration could be conducted."

45.    RNAs are a special sub-type of Area of Critical Environmental Concern ("ACEC") subject to certain regulatory mechanisms.  Designation of an RNA means that "special management attention is needed to prevent irreparable damage to important values, fish or wildlife resources, or other natural systems or processes." BLM ACEC Guidance Manual 1613; *see* 43 C.F.R. § 1610.7-2.  BLM's new "special management" to eliminate grazing aimed at sage grouse conservation in the RNA requires a finding that such "special management" is needed to prevent "irreparable damage" to sage grouse.  By eliminating grazing, the BLM has, in effect, re-designated the purpose of the RNA without making this necessary finding.

46.    The 2015 RMPA decision to eliminate grazing from the Rahilly-Gravelly Allotment and the RNA to provide an unmanaged control that will allow unfettered juniper expansion also ignores the existence of the Hart Mountain National Antelope Refuge and Sheldon National Wildlife Refuge in the vicinity of the allotment where grazing is already prohibited.  These refuges have about a half million acres of habitat that have been unavailable for grazing for over two decades.  The Sheldon Refuge in particular has topography, elevation, and vegetation similar to the RNA and is only 12 miles from the Rahilly-Gravelly Allotment.  Thus, the features of the RNA and the Sucker Creek pasture do not have substantial significance and are not unique since the Department of Interior already has thousands of acres of ungrazed sage grouse habitat.  Eliminating grazing is not necessary to prevent irreparable damage to sage grouse or sage grouse habitat and the best available science shows that eliminating management will increase the risk of loss of habitat from rapidly spreading and intense wildfire and juniper expansion.

47.    The Oregon 2015 RMPA is an artifact of a top-down decision process that fails to account for the local conditions on the ground.  The direct elimination of livestock grazing on individual allotments or pastures through a regional 2015 RMPA is unprecedented.  Existing regulatory mechanisms provide that local land managers make decisions regarding permitted use, seasonal restrictions, and other issues related to grazing permits, not regional or national policymakers.  That management structure is, in part, designed to recognize the important role and cooperation of local ranchers, such as Cahill Ranches, which devoted significant amounts of time, money, and energy into acquiring and maintaining its Rahilly-Gravelly grazing permits, including working with BLM on sage grouse/juniper removal research, and conserving and managing the public lands covered by the permit.

48.    As applied to livestock grazing and range management, the BLM - through its 2015 RMPA process - failed to find that existing range management adopted through the EA/ROD for the permit renewal poses a threat to sage grouse habitat or populations.  Nor did BLM find that the elimination of grazing on the Rahilly-Gravelly Allotment is necessary to avoid destruction or unnecessary injury to range resources.

49.    By eliminating grazing on 8,282 acres of the Rahilly-Gravelly Allotment, BLM has violated the Taylor Grazing Act, FLPMA, and the APA.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF THE TAYLOR GRAZING ACT, 43 U.S.C. § 315 *et seq.*

50.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

51.    The 2015 RMPA has improperly changed the primary use of lands within a grazing district from livestock grazing to sage grouse conservation and research in violation of the TGA.  The purpose of the TGA was "to promote the highest and best use of public lands"

and Congress authorized the creation of grazing districts, which are chiefly valuable for grazing, in order to fulfill this purpose.  43 U.S.C. § 315.

52.     The TGA states that "grazing privileges recognized and acknowledged shall be adequately safeguarded."  43 U.S.C. § 315b.  Furthermore, the Act states that "the Secretary of Interior shall . . . do any and all things necessary to accomplish the purposes of this subchapter, and to ensure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, [and] to provide for the orderly use, improvement, and development of the range."  43 U.S.C. § 315a.

53.     The elimination of grazing from the 8,282-acre Sucker Creek Pasture covering 44% of the Rahilly-Gravelly Allotment defeats the rotational grazing scheme for the allotment as a whole, effectively eliminating grazing on the allotment.  Eliminating grazing will increase the risk, spread, and intensity of wildfire.  Establishing an RNA reserve as a control that precludes any vegetation management will promote juniper encroachment.  Eliminating grazing and vegetation management will reduce sagebrush and be detrimental to perennial native grasses. The 2015 RMPA also fails to consider the range health assessment indicating that grazing on the Sucker Creek pasture is meeting range health standards.  Consequently, the 2015 RMPA decision fails to preserve the range and its resources from destruction or unnecessary injury and precludes orderly use, improvement, and development of the range in violation of the TGA, which is arbitrary and capricious under the APA, 7 U.S.C § 706(2).

///

///

///

///

**SECOND CLAIM FOR RELIEF:**
**FEDERAL LAND POLICY AND MANAGEMENT ACT**

**COUNT 1**
**Failure to Conduct Specific Examination of Range Condition of the Rahilly-Gravelly**
**Allotment Before Eliminating Grazing Use**

54.    FLPMA provides that "[t]he Secretary . . . may reexamine the condition of the range at any time and, if he finds on reexamination that the condition of the range requires adjustment in the amount or other aspect of grazing use, that the permittee or lessee shall adjust his use to the extent the Secretary concerned deems necessary."  43 U.S.C. § 1752(e).

55.    The 2015 Oregon RMPA Environmental Impact Statement ("EIS") and Great Basin ROD failed to reexamine the effects of current grazing management, sage grouse habitat and range conditions on the Rahilly-Gravelly Allotment, specifically on the 8,282-acre Sucker Creek pasture where grazing was eliminated.  The favorable condition of the range at the time of the 2015 RMPA, and through the present, is a direct result of Cahill Ranches' work to preserve sage grouse habitat and maintain a flexible grazing management program that utilizes rest rotation and other methods to achieve those standards.

56.    The 2015 RMPA EIS and Great Basin ROD fail to meaningfully consider the negative impacts of eliminating grazing on the sage grouse.  In reality, reducing or eliminating grazing increases the risk, spread, and intensity of wildfire, which FWS and BLM have identified as a primary threat to sage grouse habitat across the West, by increasing fuel loads and the continuity of fine fuels across rangelands. The extensive cooperative scientific research project across thousands of acres in the area also concluded that precluding vegetation management will result in long-term expansion of juniper and elimination of sage grouse habitat, leading to a decline in sage grouse productivity.

COMPLAINT - Page 18

57.     BLM's decision to eliminate 8,282 acres from the grazing allotment through the 2015 Oregon RMPA and Great Basin ROD ignores the information in the Rahilly-Gravelly Permit Renewal EA and Decision that concludes that grazing on the allotment supports sage grouse conservation, and ignores the site-specific research showing vegetation management to control juniper is beneficial to sage grouse survival. BLM also failed to conduct a new rangeland health assessment to demonstrate whether continued grazing is incompatible with sage grouse on the Sucker Creek pasture.  Therefore, BLM unlawfully failed to conduct a specific reexamination of the range condition for the allotment before eliminating grazing in violation of 43 U.S.C. § 1752(e), which is arbitrary and capricious in violation of the APA, 7 U.SC. § 706(2).

### COUNT 2
### Failure to Achieve Multiple-Use and Sustained-Yield

58.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

59.     By eliminating grazing on the Sucker Creek pasture through the 2015 RMPA, BLM has effectively displaced grazing as a principal and major use of the land, undermining the multiple-use and sustained-yield requirements of FLPMA. 43 U.S.C. § 1702(1).

60.     Converting the Sucker Creek pasture to a no management reserve will harm sage grouse by increasing the risk, spread, and intensity of wildfire and the invasion of juniper, increasing the loss of sage grouse habitat and reducing the productivity of sage grouse.  The mismanagement caused by implementation of the BLM's flawed 2015 decision could lead to an Endangered Species listing, which will harm Cahill Ranches' operations even further. Eliminating management with these negative consequences violates the FLPMA requirements to manage public lands for multiple-use and sustained-yield of range and wildlife resources.

61.     BLM was arbitrary and capricious and failed to consider important aspects of the problem in violation of the Administrative Procedure Act, U.SC. § 706(2), by establishing a no

COMPLAINT - Page 19

management reserve without considering among other things: the rangeland health assessment for the Rahilly-Gravelly Allotment; the existence of the Hart Mountain National Antelope Refuge and Sheldon National Wildlife Refuge in the vicinity of the allotment where grazing is already prohibited; the results of the sage grouse habitat juniper removal study which indicated that juniper removal supported perpetuation of sage grouse habitat; and the economic impact of limiting grazing on the Sucker Creek and the associated loss in revenue that would discourage future sage grouse habitat improvement on private land.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court grant the following relief:

A.    Order, adjudge, and declare that in deciding to eliminate grazing from the Sucker Creek pasture of the Rahilly-Gravelly Allotment, the 2015 Oregon Sub-Regional Greater Sage Grouse Resource Management Plan Amendment and 2015 Record of Decision violates the Taylor Grazing Act, and the Federal Land Policy and Management Act, and the Administrative Procedure Act.

B.    Vacate the 2015 Oregon Sub-Regional RMPA and 2015 ROD as applied to the Sucker Creek pasture of the Rahilly-Gravelly Allotment;

C.    Enter such declaratory and/or injunctive relief as may specifically be requested hereafter;

D.    Award plaintiff its reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*, and/or all other applicable authorities; and

///

///

E.      Grant such further relief as the Court deems necessary or appropriate in order to remedy defendant's violations of law.

Respectfully submitted this 16th day of September, 2021.

/s/ Tate Justesen
Tate Justesen, Ore. Bar #083741

/s/ Aaron Bruner
Aaron Bruner, Ore. Bar #133113
Western Resources Legal Center
9220 SW Barbur Blvd., Suite 119-327
Portland, Oregon 97219
Telephone: (503) 768-8500
Email: tjustesen@wrlegal.org
Email: abruner@wrlegal.org