**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR  97211
(503) 525-0193
lacy@onda.org

**David H. Becker (OSB # 081507**)
Law Office of David H. Becker, LLC
24242 S. Engstrom Rd.
Colton, OR 97017
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Defendant-Intervenor

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**MEDFORD DIVISION**

| | |
|---|---|
| **CAHILL RANCHES, INC.,** | No. 1:21-cv-1363-CL |
| Plaintiff, | |
| v. | **DEFENDANT-INTERVENOR'S FIRST AMENDED ANSWER** |
| **BUREAU OF LAND MANAGEMENT,** | |
| Defendant, | |
| and | |
| **OREGON NATURAL DESERT ASSOCIATION,** | |
| Defendant-Intervenor | |

DEFENDANT-INTERVENOR'S FIRST AMENDED ANSWER

1

Defendant-Intervenor, the Oregon Natural Desert Association ("ONDA"), submits this First Amended Answer to the plaintiff's (Cahill Ranches, Inc., or "Cahill") complaint (ECF 1). ONDA filed its Answer (ECF 37) on March 21, 2023, lodging the same Proposed Answer upon which this Court based its Order, dated December 10, 2021 (ECF 24), granting ONDA's motion to intervene (ECF 11) in this case. Given the passage of time since this case was filed, ONDA now files this First Amended Answer as a matter of course. Fed. R. Civ. P. 15(a). The answer begins at Section I of this pleading.

## I. ANSWER

ONDA hereby answers Cahill's Complaint against Federal defendants in this matter using the same numbering scheme as in the complaint. Unless specific responses to individual sentences or allegations are indicated, the response herein applies to the entire corresponding paragraph of Cahill's complaint against Federal defendants. ONDA admits, denies, and alleges as follows:

1. Admit that Cahill characterizes its case, characterizes multiple federal agency decisions, and characterizes the effect of an Idaho court ruling. ONDA denies the accuracy of Cahill's characterizations of these decisions and their effects, except that ONDA admits that a federal district court in Idaho ordered that "BLM is enjoined from implementing the 2019 BLM Sage-Grouse Plan Amendments for Idaho, Wyoming, Colorado, Utah, Nevada/Northeastern California, and Oregon, until such time as the Court can adjudicate the claims on the merits" and that "[t]he 2015 Plans remain in effect during this time." *W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019). ONDA further avers that this Court too has recognized that "there is a fixed decree that the 2015 Plans remain in effect" and that this Court has also ordered that "BLM must make unavailable to grazing the portions of the key [Research Natural

Areas] specified in the 2015 ARMPA without further delay." *Or. Nat. Desert Ass'n v. Bushue*, -- F. Supp. 3d --, 2022 WL 17487065, at *7, *21 (D. Or. Dec. 7, 2022) (internal alteration and quotation marks omitted in first quotation) (in the related case, number 3:19-cv-1550-SI).

2. Admit that Cahill further characterizes its challenge, but deny that the "headquarters' decision" is contrary to the Administrative Procedure Act.

3. Admit that Cahill further characterizes its challenge in the first sentence. Admit the second sentence except to note that the Rahilly-Gravelly Allotment consists of 33,285 acres of public land, not 18,678 acres as stated by Cahill. Deny the third sentence insofar as the Sucker Creek unit is about 9,000 acres in size, and the 8,282 acres quoted by Cahill is in fact the size of the area excluded from grazing by the Oregon ARMPA; and otherwise state that ONDA lacks knowledge or information sufficient to form a belief concerning the details of Cahill's "grazing scheme" prior to adoption of the Oregon ARMPA in 2015, but admit that Cahill has not conformed to a consistent, immutable grazing scheme between 2016 and 2022, consistently grazing an actual number of Animal Unit Months ("AUMs") equivalent to less than half of the number for which it holds grazing permits, grazing at different time periods on certain pastures than it was authorized to do in the schedule approved by the Bureau of Land Management ("BLM" or "the Bureau"), taking more AUMs of "non-use" on the Sucker Creek unit than would be unavailable for grazing under the Oregon ARMPA, and using grazing rotations other than the Bureau approved in its 2014 decision regarding grazing on the Rahilly-Gravelly Allotment. Admit the fourth sentence, except ONDA denies that any illegal actions or inactions occurred.

4. ONDA lacks knowledge or information sufficient to form a belief concerning the details of the vegetation and otherwise unnamed vegetation studies characterized in this paragraph.

5. Admit that Cahill characterizes what it thinks is "needed" in this area, and otherwise deny that any illegal actions or inactions occurred.

6. Admit that Cahill alleges legal conclusions regarding subject matter jurisdiction.

7. Admit that Cahill alleges legal conclusions regarding exhaustion of administrative remedies, subject matter jurisdiction, ripeness, relief, and sovereign immunity.

8. Admit that Cahill alleges legal conclusions regarding venue, but aver that ONDA lacks knowledge or information sufficient to form a belief concerning the location of Cahill's ranch.

9. ONDA lacks knowledge or information sufficient to form a belief concerning the details of Cahill's corporate status or activities as alleged. Admit that the Oregon ARMPA made 8,282 acres of public land within the Rahilly-Gravelly key ACEC/RNA unavailable to livestock grazing, but note that the Rahilly-Gravelly Allotment is about 33,285 acres in size, not 18,678 acres as stated by Cahill—and therefore deny Cahill's calculations as to what percentage of Cahill's permitted use was affected by the decision. Further aver that Cahill holds federal public lands grazing permits for five allotments, with a total of 4,631 permitted AUMs across the five allotments, of which approximately 586 are made unavailable by the Oregon ARMPA.

10. Admit.

11. Admit that Cahill alleges legal conclusions regarding the requirements of the Taylor Grazing Act, 43 U.S.C. §315.

12. Admit that Cahill alleges legal conclusions regarding the requirements of the Taylor Grazing Act, 43 U.S.C. §315, and further aver that Congress passed the Act "[t]o stop injury to the public grazing lands by preventing overgrazing and soil deterioration," 48 Stat. 1269, preamble, June 28, 1934, and directed that "[t]he Secretary of the Interior shall . . . do any

and all things necessary to accomplish the purposes of this Act and to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, to provide for the orderly use, improvement, and development of the range." 43 U.S.C. § 315a.

13. Admit that Cahill alleges legal conclusions regarding the requirements of the Taylor Grazing Act, 43 U.S.C. §315.

14. Admit that Cahill alleges legal conclusions regarding the requirements of the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701–87.

15. Admit that in the first sentence Cahill characterizes one of the thirteen Congressional statements of policy in 43 U.S.C. § 1701(a), and further aver that section 1701(a)(8) also is relevant to this case, providing that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." Admit that Cahill alleges legal conclusions regarding additional requirements of FLPMA, in the second and third sentences of this paragraph.

16. Admit that Cahill alleges legal conclusions regarding the requirements of and interplay between the Taylor Grazing Act and FLPMA.

17. Admit.

18. Admit.

19. ONDA lacks knowledge or information sufficient to form a belief concerning the details of Cahill's ranching operation.

20. ONDA lacks knowledge or information sufficient to form a belief concerning the details of Cahill's "cooperative" land management efforts, except to note that ONDA is not aware that Cahill participated in the Governor of Oregon's cooperative, stakeholder-driven Sage Grouse Conservation Partnership ("SageCon").

21. ONDA lacks knowledge or information sufficient to form a belief concerning the details of Cahill's land management activities and economic viability, except to incorporate herein Paragraph 3 above and further aver that Cahill received $1,035,946 in federal government farm subsidies to sustain its operations between 2014 and 2021.[1]

22. Deny the first two sentences, on the basis that a population viability analysis in 2010 showed a 100% probability that the Western Great Basin population, which includes the sage-grouse that live on the Rahilly-Gravelly Allotment, will decline below 500 birds (the minimum size to maintain population viability) in 100 years if the lands' carrying capacity continues to decline (Garton 2011)[2]; and, further, that refreshed data in 2015 showed that the Western Great Basin Population now has an estimated minimum population size of just 1,934 males, which represents a 69% decline from the reconstructed estimate of 6,327 males in 2007, to reach "abundances lower than ever observed before and approximately 16% of average values close to 11,765 males counted in the 1970s and 1980s" (Garton *et al*. 2015)[3]; and, further, that

---

[1] Environmental Working Group, USDA SUBSIDY INFORMATION FOR CAHILL RANCHES INC, https://farm.ewg.org/persondetail.php?custnumber=A09419901 (last visited Apr. 10, 2023).

[2] Garton, E.O., *et al*. 2011. Greater Sage-Grouse Population Dynamics and Probability of Persistence. *In* S.T. Knick and J.W. Connelly (eds). Greater Sage-Grouse: Ecology and conservation of a landscape species and its habitats. Studies in Avian Biology Series, Univ. of Cal. Press, Berkley, CA 38: 293–381.

[3] Garton *et al*. 2015. Greater Sage-Grouse Population Dynamics and Probability of Persistence. Final Report to PEW Charitable Trusts, Portland, OR. *Available at* http://www.pewtrusts.org/~/media/Assets/2015/04/Garton-et-al-2015-Greater-SageGrouse-Population-Dynamics-and-Persistence-31815.pdf (last visited Apr. 10, 2023).

the Oregon Department of Fish and Wildlife ("ODFW") has calculated that the statewide population in Oregon has declined to fewer than 16,000 birds, far below the State of Oregon's population goal based on ODFW's 2003 baseline population estimate of 29,237 individuals statewide. ONDA lacks knowledge or information sufficient to form a belief concerning the details of Cahill's characterization of the ranch's success in the third sentence

23.     Admit that this paragraph generally describes one way a "rest-rotation grazing strategy" might be implemented, but otherwise deny Cahill's characterization of the effects of making changes to a rest-rotation system. Incorporate by reference Paragraph 3 above related to Cahill's operations.

24.     Deny.

25.     Admit that Cahill purports to characterize Table 2-6 at page 2-18 of the Oregon ARMPA, but aver that the Rahilly-Gravelly Allotment consists of 33,285 acres, not 18,678 acres as stated. Deny the second sentence.

26.     ONDA lacks knowledge or information sufficient to form a belief concerning the details of Cahill's characterizations of how it has carried out its grazing operations in the Sucker Creek area, and the referenced Bureau findings.

27.     ONDA lacks knowledge or information sufficient to form a belief concerning the details of Cahill's "experience," but aver that livestock grazing can degrade sage-grouse habitat, directly and indirectly, as, among other impacts, grazing cattle consume the native plants the sage-grouse need for hiding, cover, and food; trample and compact soils, springs, and wet meadows; trample and damage stream banks; increase soil erosion; increase the proliferation of exotic plant species including cheatgrass, a rapidly-spreading, non-native grass that is replacing sagebrush; increase the expansion of juniper in grazed areas; and pollute streams with feces,

urine, and eroded sediment. ONDA further avers that livestock grazing also intensifies global climate change as cattle emit methane gas and impede the ability of native plants and soil to sequester carbon—making grazed landscapes into sources of increased greenhouse gas emissions, whereas ungrazed lands absorb more carbon from the atmosphere than they release.[4]

28. Admit that the ODFW developed a *Conservation Assessment and Strategy* (hereafter the "*Strategy*") for greater sage-grouse in 2011.

29. Admit that Cahill accurately quotes from two sentences in the *Strategy*.

30. Admit.

31. Admit that Cahill accurately quotes this sentence from the *Strategy*.

32. ONDA lacks knowledge or information sufficient to form a belief concerning the details of the ODFW letter referenced by Cahill, except to aver, on information and belief, that the referenced letter was written by an ODFW biologist and was written in 2017, after the Oregon ARMPA was adopted in 2015, although the date and circumstances of the letter are not provided in the Complaint.

33. Admit.

34. Admit that the Bureau issued a Proposed Decision in May 2014 proposing to renew a 10-year permit to graze livestock on five different allotments including the Rahilly-Gravelly Allotment, but further aver that a federally-issued grazing permit gives the holder only a revocable license to graze private livestock on the public lands. It conveys no right, title, or interest to any of the federal public lands held by the Bureau, and may be modified, suspended, or cancelled as required by land use plans and applicable law. 43 U.S.C. § 315b ("the creation of

---

[4] Kauffman, J. Boone, *et al.*, *Livestock Use on Public Lands in the Western USA Exacerbates Climate Change: Implications for Climate Change Mitigation and Adaptation*, 69 Envtl. Mgmt. 1137 (2022), https://doi.org/10.1007/s00267-022-01633-8.

a grazing district or the issuance of a permit pursuant to the provisions of this subchapter shall not create any right, title, interest, or estate in or to the [public] lands"); *see also Pub. Lands Council v. Babbitt*, 529 U.S. 728, 735 (2000) (noting that conditions placed on permits reflect the "leasehold nature of grazing privileges"; that Congress has "made the grant of grazing privileges discretionary"; and that the federal government "retained the power to modify, fail to renew, or cancel a permit or lease for various reasons"); *Osborne v. United States*, 145 F.2d 892, 896 (9th Cir. 1944) ("it has always been the intention and policy of the government to regard the use of its public lands for stock grazing . . . as a privilege which is withdrawable at any time for any use by the sovereign without the payment of compensation").

35. ONDA lacks knowledge or information sufficient to form a belief concerning whether anyone protested the proposed decision. ONDA otherwise admits that Cahill alleges legal conclusions regarding the effect or operation of the Bureau's grazing regulations.

36. Admit that Cahill quotes (albeit with non-substantive typographical errors) from the referenced proposed decision.

37. Admit that Cahill accurately quotes from the referenced proposed decision.

38. Admit that Cahill quotes (again with non-substantive typographical errors) from the referenced proposed decision.

39. Admit that Cahill characterizes the Oregon ARMPA, but otherwise deny that any illegal actions or inactions occurred.

40. Admit the first sentence and admit that the second and fifth sentences contain accurate quotations of the referenced decision, but deny the third and fourth sentences on the basis that they constitute Cahill's characterizations of the United States Fish and Wildlife Service's "warranted" decision, and further aver that the Service in that decision found that

livestock grazing and other activities "individually and in combination, are contributing to the destruction, modification, or curtailment of the greater sage-grouse's habitat or range." 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910, 13,986 (Mar. 23, 2010).

41. Admit.

42. Admit that the Great Basin Record of Decision makes 8,282 acres of public land within the Rahilly-Gravelly key ACEC/RNA unavailable to grazing, but further aver that on Bureau-managed lands in Oregon, 12,083,622 acres will continue to be available for livestock grazing in Greater sage-grouse habitat, while only 22,765 acres will be unavailable to livestock grazing in "key RNAs" including Rahilly-Gravelly.

43. Admit, but further aver that the in the 2003 Lakeview Resource Management Plan, the Bureau stated that continued grazing would be allowed only "if the [designated ACEC/RNA] values will be maintained or enhanced" and "[w]here adverse impacts are identified, existing livestock use will be adjusted using a variety of methods, including, but not limited to, fencing, reduction in livestock numbers, and changes in grazing season of use" and "[t]he high concentration of greater sage-grouse leks in the ACEC (Map W-1) will be managed to maintain the continuity of greater sage-grouse habitat and to avoid disturbance during the breeding season."

44. ONDA lacks knowledge or information sufficient to form a belief concerning the statements and unattributed quotation in this paragraph.

45. Admit the first two sentences, but further aver that, in its 2003 Lakeview Resource Management Plan, the Bureau defines a "Research Natural Area" is an "area where

natural processes predominate and which is preserved for research and education." Deny the remainder of this paragraph.

46. Admit that in the first, fourth, and fifth sentences Cahill characterizes the challenged Bureau decision and the geographic area that is the subject of this lawsuit, but otherwise deny that any illegal actions or inactions occurred. Admit the second sentence. Admit that the Sheldon National Wildlife Refuge, managed by the U.S. Fish and Wildlife Service, is about 12 miles from the Rahilly-Gravelly Allotment.

47. Admit that this paragraph is Cahill's characterization of the challenged Bureau decision, but otherwise deny that any illegal actions or inactions occurred.

48. Admit that this paragraph is Cahill's characterization of the challenged Bureau decision, but otherwise deny that any illegal actions or inactions occurred.

49. Deny.

## ALLEGED FIRST CLAIM

50. ONDA repeats and incorporates by reference all its responses to the previous paragraphs in Cahill's pleading.

51. Deny.

52. Admit.

53. Deny as speculative and otherwise reserve all legal defenses against Cahill's proposed conclusions of law.

## ALLEGED SECOND CLAIM

54. Admit.

55. ONDA lacks knowledge or information sufficient to form a belief concerning the allegations, but otherwise denies the allegations.

56. Deny as speculative and otherwise reserve all legal defenses against Cahill's proposed conclusions of law.

57. ONDA lacks knowledge or information sufficient to form a belief concerning the allegations, but otherwise denies the allegations.

58. ONDA repeats and incorporates by reference all its responses to the previous paragraphs in Cahill's pleading.

59. ONDA lacks knowledge or information sufficient to form a belief concerning the allegations, but otherwise denies the allegations.

60. Deny as speculative and otherwise reserve all legal defenses against Cahill's proposed conclusions of law.

61. Deny.

## RELIEF REQUESTED

The remainder of the Complaint constitutes Cahill's Prayer for Relief, to which no response is required. To the extent a further response may be required, ONDA denies that Cahill is entitled to the relief requested on the grounds specified in the Complaint.

## II. DEFENSES

1. Cahill fails to state a claim on which relief may be granted.

2. Cahill lacks standing to pursue its claims.

3. Cahill's claims are not ripe for judicial review.

4. Cahill's claims are barred by res judicata and collateral estoppel.

5. Cahill's claims are barred by the doctrine of laches.

## III. INTERVENOR'S REQUEST FOR RELIEF

WHEREFORE, Intervenor respectfully requests that this Court:

      A.      Dismiss Cahill's Complaint with prejudice;

      B.      Enter judgment against Cahill and for Federal defendants and for intervenor;

      C.      Award reasonable attorney fees and costs to Federal defendants and intervenor;

and

      D.      Grant such other further relief as Federal defendants or intervenor may request or the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of April, 2023.

s/ Peter M. Lacy

_____

Peter M. ("Mac") Lacy
Oregon Natural Desert Association

*Of Attorneys for Defendant-Intervenor*